OGNIAN GAVRILOV, CA SBN: 258583
MARY ANNE MARTIN, CA SBN: 253000
GAVRILOV & BROOKS
2315 Capitol Avenue
Sacramento, CA 95816
Phone: (916) 504-0529
Facsimile: (916) 727-6877
Email: mmartin@gavrilovlaw.com

Attorneys for minor Plaintiff G.L.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

G.L., through his guardian ad litem Robert L.,

    Plaintiff,

  v.

MELANIE CATANIO, an individual;
NANCY COCHRANE, an individual;
DONALD ROWBERRY, an individual;
ANNE MARIE SCHUBERT, as Sacramento
County District Attorney; DAVID CANEPA,
an individual; and CITY OF FOLSOM, a
public entity.

    Defendants.

Case No.

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**

**JURY TRIAL DEMANDED**

Plaintiff G.L. ("Plaintiff" or "G.L."), by his attorneys and guardian ad litem Robert L., hereby alleges the following on information and belief (the true names of minors are replaced with their initials to protect their privacy):

## NATURE OF THE CASE

1. This is the tragic true story of a little boy harassed, silenced, and used as a pawn by overzealous police and prosecutors willing to engage in misconduct to cobble together a case by any means necessary. It is an action pursuant to 42 U.S.C. §§ 1983, 1985 and 1986, and the

1

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Fourth and Fourteenth Amendments to the United States Constitution. Plaintiff also brings state claims for false imprisonment and judicial deception.

## PARTIES

2.     Plaintiff G.L. is a thirteen-year-old citizen of California and of the United States who resides in the County of Sacramento with his father Robert L. ("Robb") and younger sister I.L. Beginning in December of 2018 when he was 9 years old through August of 2021, G.L. was continuously victimized by the malfeasance of the parties identified below, who engaged in numerous Constitutionally violative tactics throughout the course of their dealings with G.L. At or near the time of filing of this complaint, Robb has or will file a request for appointment as Guardian Ad Litem for his minor son G.L.

3.     Defendant MELANIE CATANIO ("CATANIO" or "Defendant") is a citizen of California and the United States who was at all times relevant a resident of the County of Sacramento and an officer, agent and/or employee of CITY OF FOLSOM. On information and belief, CATANIO now resides in the County of Shasta, California. At all times relevant to the allegations of this complaint CATANIO was acting, albeit unlawfully, under color of law within the meaning of 42 U.S.C. § 1983 and within the scope of her employment as a Detective for the Folsom Police Department. CATANIO is sued here in her individual capacity and as an employee of the CITY OF FOLSOM.

4.     Defendant NANCY COCHRANE ("COCHRANE" or "Defendant") is a citizen of California and the United States who resides in the County of Sacramento. At all times relevant to the allegations of this complaint COCHRANE was acting, albeit unlawfully, under color of law within the meaning of 42 U.S.C. § 1983 and within the scope of her employment as a Deputy District Attorney for the Sacramento County District Attorney's Office. COCHRANE is sued here in her individual capacity.

5.     Defendant DONALD ROWBERRY ("ROWBERRY" or "Defendant") is a citizen of California and the United States who resides in the County of Sacramento. At all times relevant to the allegations in this complaint ROWBERRY was acting, albeit unlawfully, under color of law within the meaning of 42 U.S.C. § 1983 and within the scope of his

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

employment as a computer forensic examiner for the Folsom Police Department. ROWBERRY is sued here individually and as an employee of the CITY OF FOLSOM.

6.      Defendant ANNE MARIE SCHUBERT ("SCHUBERT" or "Defendant") is a citizen of California and the United States who resides in the County of Sacramento. At all times relevant to the allegations in this complaint SCHUBERT was acting, albeit unlawfully, under color of law within the meaning of 42 U.S.C. § 1983 and within the scope of her employment. SCHUBERT is sued here in her official capacity as the District Attorney of Sacramento County as to which County she was the final authoritative decisionmaker and policymaker with respect to the office of the District Attorney in all respects relevant to the allegations of this complaint.

7.      Defendant DAVID CANEPA ("CANEPA" or "Defendant") is a citizen of California and the United States who resides in the County of Sacramento. At all times relevant to the allegations in this complaint CANEPA was acting, albeit unlawfully, under color of law within the meaning of 42 U.S.C. § 1983 and within the scope of his employment as custodian of records for the Folsom Police Department. CANEPA is sued here individually and as an employee of the CITY OF FOLSOM.

8.      Defendant CITY OF FOLSOM, CALIFORNIA ("CITY OF FOLSOM" or "Defendant") is a city that is a political subdivision of the State of California, and was the employer of Defendants MELANIE CATANIO, DONALD ROWBERRY, and DAVID CANEPA, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Folsom Police Department and its Detectives, Officers and employees. The CITY OF FOLSOM and all of the Defendants working for Defendant CITY OF FOLSOM acted under color of state law and consistent with the customs, patterns, and practices established by the CITY OF FOLSOM.

9.       Defendants CATANIO, COCHRANE, ROWBERRY, SCHUBERT, CANEPA, and CITY OF FOLSOM are herein referred to collectively as "Defendants."

//

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

**JURISDICTION AND VENUE**

10.     This action is brought pursuant to 42 U.S.C. § 1983, to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

11.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

12.     Venue is proper within the Eastern District of California under 28 U.S.C. § 1391(b) because this is the District in which the claims arose.

**FACTUAL ALLEGATIONS**

**First Home Interview – G.L. Denied Abuse**

13.     On or about July 18, 2018, a female employee from Child Protective Services ("CPS") named Nahren Shahbzian arrived at the home of G.L.'s parents Robb & Mrs. L uninvited for the purpose of interviewing their two youngest children. There was no open CPS case against Robb at that time. Nor is there an open CPS case regarding G.L. or his parents at this time.[1] Mr. & Mrs. L allowed the CPS employee into their home and made arrangements for her to interview each child in a private room while Mr. & Mrs. L remained in the living room.

14.     G.L., who was 8 years old at the time, and his little sister I.L. who was then 7 years old, spoke to the CPS worker separately. This CPS home visit lasted more than two hours, and both children independently denied that they were sexually abused. CPS employee Ms. Shahbzian told G.L.'s parents before leaving their home that she would be closing out the case pertaining to G.L. and I.L., and that her participation was over. A report summarizing the July 18, 2018 visit to the home of Mr. & Mrs. L was thereafter prepared and provided to Folsom Police Detective CATANIO, who later shared such report with Deputy District Attorney ("DDA") COCHRANE.

15.     On or about September 16, 2018, G.L. wrote a newspaper article for school that described his family, hobbies, preferred nickname and their recent family cruise from Long Beach to Mexico. G.L.'s school newspaper project indicated he was a well-adjusted fourth

---

[1] There is no lawsuit pending nor threatened against CPS and its employees by Plaintiff, including Ms. Shahbzian.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

grader who enjoyed spending time with both parents and riding dirt bikes in 2018. His childhood was destroyed by Defendants soon thereafter.

### School Interview – G.L. Denied Abuse for a Second Time

16. On or about December 4, 2018, Folsom Police Detective CATANIO removed G.L. from his 3rd grade classroom and I.L. from her 2nd grade classroom at Natoma Station Elementary School to question them in a private room without the knowledge or consent of their parents (the "School Interviews"). Using her department-issued cell phone, CATANIO audio recorded separate School Interviews with G.L. and his sister I.L. at Natoma Station Elementary. Both children again repeatedly denied that they were sexually abused at home.

17. During the School Interview, CATANIO informed G.L. that his older brother(s) reported that their mother had sexually abused them, that G.L.'s brother had witnessed their mother do "something inappropriate to G.L.'s body," and *stated her belief that G.L. was sexually assaulted by their mother*. G.L. responded that his brothers were liars who enjoyed causing drama and reiterated that his mother had not sexually abused him. CATANIO provided G.L. with her business card and instructed him to call her if there was any information he wanted to share.

18. CATANIO left Natoma Station Elementary and thereafter failed to log the audio recording(s) of the School Interviews with G.L. and his sister I.L. into evidence and/or the LYNX evidence database. However, CATANIO did upload the School Interviews from her department issued cell phone to her department issued laptop computer. CATANIO and ROWBERRY later denied an outside investigator from accessing CATANIO's department issued laptop computer and cell phone where the School Interviews had been saved, which prevented an independent determination about whether the School Interview recordings could be recovered from either device prior to Mrs. L's criminal trial in August of 2021.

19. No data recovery was undertaken by any Defendant to determine whether the School Interview recordings could be retrieved from CATANIO's department-issued cell phone or laptop, nor whether the audio recordings had been electronically archived elsewhere.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

20.    CATANIO later disclosed the substance of the School Interview denials and the existence of the audio recording(s) of the School Interviews to DDA COCHRANE. At the behest of DDA COCHRANE, CATANIO destroyed the exculpatory audio recording(s) of the School Interview and had ROWBERRY "wipe clean" CATANIO's computer hard drive to conceal the evidence of CATANIO's witness tainting and G.L.'s denials. CATANIO and ROWBERRY also disposed of the department-issued cell phone CATANIO used to record the School Interviews. The destruction of the School Interview tapes was significant because the audio recording proves that CATANIO intentionally tried to taint G.L.'s testimony – whom she knew would be a witness in the case – by telling G.L. that she and his brothers "knew" that G.L. had been "sexually assaulted" by his mother.

21.    When CATANIO was tasked with investigating the allegations against G.L.'s mother, she was a *four-month rookie* to the investigations department with only a few months of specialized training and a few years as a patrol officer. DDA COCHRANE was a seasoned prosecutor with decades of experience. CATANIO was encouraged to taint witness testimony and destroy evidence by COCHRANE, who demanded throughout the investigation that CATANIO covertly place her thumb on the scale of justice to tip the balance in the prosecution's favor.

### Criminal Investigation Against G.L.'s Mother Intensified

22.    CATANIO continued to harass G.L.'s family despite G.L. and his sister I.L. repeatedly denying sexual abuse. Mrs. L became aware that a warrant had been issued for her arrest, and on or about June 15, 2019, Mrs. L self-surrendered to law enforcement at the Sacramento County Jail. Mrs. L was a married mother of five children with no criminal history at the time she was taken into custody. The felony complaint filed on June 13, 2019 charged Mrs. L with eleven counts of violating Penal Code Section 288(a), lewd and lascivious acts with minors, between 2002 and 2008 related to allegations made by G.L.'s older brothers. Mrs. L's bail was set at $750,000.

///

///

6

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

**G.L.'s Aunt in Law Enforcement Denied G.L.'s Abuse to COCHRANE**

23.    In or about mid-June of 2019, G.L.'s maternal aunt spoke to DDA COCHRANE by telephone. She identified herself as a Deputy District Attorney in a neighboring jurisdiction and expressed grave concerns about the credibility of the allegations made by G.L.'s older brothers. COCHRANE was informed that G.L.'s eldest brother was angry because he believed their mother was responsible for the January 14, 2018 police search of his Wyoming home that resulted in his drug conviction on June 6, 2018. G.L.'s aunt explained to COCHRANE that she had reported her eldest nephew to police for drug trafficking in late 2017, and that he had retaliated by accusing his mother of sexually abusing him to CATANIO just a few days after his drug sentencing in June of 2018. COCHRANE was able to independently corroborate this information through the records in her possession at that time.

24.    COCHRANE further learned from G.L.'s aunt that G.L.'s older brothers had extensive histories of lying and drug abuse, and that G.L.'s middle brother had a motive to exaggerate because he was seeking to become emancipated against the wishes of their parents. Upon learning these inconvenient truths, COCHRANE realized her case was weakened by the credibility issues identified by G.L.'s aunt, so she abruptly terminated the telephone call.

25.    On information and belief, COCHRANE thereafter communicated with CATANIO to fabricate probable cause against G.L.'s mother so that she could be charged with additional crimes that were more recent. In other words, COCHRANE and CATANIO conspired to manufacture a new victim – G.L. – after they realized their weak case involving accusations from dubious witnesses that were over a decade old would need corroboration from a witness like G.L. with an unblemished reputation.

**Second Home Interview – G.L. Denied Abuse for a Third Time**

26.    In or about mid-June of 2019 while Mrs. L was in custody, the same female CPS employee Ms. Nahren Shabzian again returned to G.L.'s home to speak with him, his younger sister, and their father Robb. G.L. and his sister again denied that their mother had sexually abused them. This was memorialized in a report later provided to CATANIO and COCHRANE. At the demand of CATANIO and COCHRANE (which was communicated by CPS), Robb

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

reluctantly agreed to bring G.L. and I.L. to the Sacramento County Special Assault Forensic Evaluation Center ("CPS SAFE Center") to speak with a licensed counselor a few days later. At no time did G.L. consent to meeting with CPS nor Folsom Police.

**CPS SAFE Center Interview – Illegal Seizure; G.L. Denied Abuse for a Fourth Time**

27.     On or about June 28, 2019, while Mrs. L remained in custody at the Sacramento County Jail, Robb brought G.L. and I.L. to the CPS interview at the SAFE Center on Power Inn Road pursuant to CPS's demand (the "SAFE Center Interviews"). Robb toured the room where the children would be questioned, which included a one-way mirror and video monitoring that made him and the children feel unable to leave. When Robb realized that his youngest children were going to be subjected to a custodial interrogation instead of receive counseling services, he demanded to leave with them. At no time was G.L.'s father Robb charged with any crime or accused of abusing his children. And at no point on June 28, 2019 (or any other day) was Robb presented with a warrant or other Emergency Protective Order to authorize the removal of G.L. (or I.L.) from his custody.

28.     Nevertheless, CATANIO informed Robb that G.L. (and I.L.) would be taken into protective custody if he did not agree to the CPS SAFE Center interview. This threatening exchange was audio recorded and logged into evidence by CATANIO, and provided to COCHRANE, but was not produced or disclosed to Plaintiff's parents nor Mrs. L's criminal defense attorney during the criminal discovery process. COCHRANE was in communication with CATANIO throughout the CPS SAFE Center interview and directed CATANIO to threaten Robb with the forcible removal of his children without a warrant. CATANIO and COCHRANE both knew that Mrs. L was in custody at the Sacramento County Jail and thus there was no danger posed to the children, and both knew that no other exigent circumstances existed. CATANIO and COCHRANE sought to conceal the existence of the audio tape of CATANIO threatening Robb at the CPS SAFE Center because they knew that their conduct violated G.L.'s clearly-established Fourth and Fourteenth Amendment rights.

29.     CATANIO forced Robb into the hallway to separate him from his two young children while she and the same female CPS worker Ms. Shahbzian who had twice interviewed

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

G.L. at his home watched interviewer Darla Garcia conduct separate interviews with G.L and I.L. from behind a one-way mirror.  Both G.L. and I.L. again denied being sexually abused by their mother. While G.L. was interviewed for over an hour at the CPS SAFE Center, CATANIO and the female CPS employee observed behind a one-way mirror while COCHRANE watched a live video feed of the interview remotely. COCHRANE, CATANIO and the interviewer communicated with each other throughout the CPS SAFE Center Interview, including during at least three "breaks" away from G.L. lasting approximately seven or more minutes each.

30.     DDA COCHRANE acted in an investigative capacity with Detective CATANIO during the CPS SAFE Center Interviews and throughout the investigation pertaining to G.L.'s mother.

31.     At the outset of his CPS SAFE Center Interview, G.L. explained that CATANIO had previously attempted to improperly influence his statements during the School Interview: "The detective, um, we met them at our school once – we met her at our school once because we had to go – we had to go see her and, um, she said that I was assaulted when I was 5 and I'm – and I said no I wasn't."

32.     Later in the CPS SAFE Center Interview, when G.L. is asked about CATANIO interviewing him at school, he *again* stated that "She [Catanio] said that I was not assaulted, but sexually assaulted. Um, when I was 5, and I was like, 'I didn't have – I don't have any recall of that.' And she said…" At this critical moment of the CPS SAFE Center Interview, G.L. was interrupted and cut off by the interviewer at COCHRANE's direction to prevent him from divulging how CATANIO tried to taint G.L.'s memory and testimony during the School Interview.

33.     During the CPS SAFE Center Interview and School Interview, G.L. and his sister reported normal caretaking behaviors by both parents which did not amount to sexual abuse. When asked whether "anything ever happened to your front private?", G.L. replied "no." When asked whether anyone told G.L. what to say during the CPS SAFE Center Interview, he said "no, not at all." When asked whether anyone told G.L. not to tell the interviewer anything, G.L.

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

again replies, "no." When asked about how he felt about his mom going to jail, G.L. replied, "I mean, sad obviously."

34.    When asked if there was anything G.L. didn't like about his mother going to jail, he replied that "the thing that I don't like about it. Is that we have to go through all this. Go through this is – this isn't therapy, but this is like an interview." In other words, the 9-year-old G.L. articulated that he did not consent to being questioned during the CPS SAFE Center Interview; G.L.'s objection to his seizure and interrogation was heard by both CATANIO and COCHRANE in real time.

35.    The interviewer eventually told G.L. to go into another room across the hall and said, "I'm gonna see what other questions we have. If we do have more questions, we can come back in here." That should have been the end of the CPS SAFE Center Interview.

36.    Instead, CATANIO, COCHRANE and the interviewer communicated with each other in G.L.'s absence during the first "break." COCHRANE and CATANIO conspired to intimidate G.L. to manipulate and taint the 9-year-old witness's statements. The interviewer retrieved G.L. and resumed the CPS SAFE Center Interview armed with interrogation questions prepared by COCHRANE and CATANIO during the "break."

37.    G.L. was then asked a series of 41 more questions about the family's interactions, sleeping arrangements, cuddling, bathing and showering. G.L.'s responses indicated there was no sexual abuse going on. For example, when asked if there was "ever a time that it was just you and your mom that would cuddle?", G.L. replied, "No. It would always be at least three of us. Me, my sister and my mom. Or me and my sister and my dad." When asked about their showering and grooming, the interviewer said, "So she would wash your hair and you said that she also helped you brush your teeth." G.L. replied, "Yeah." When asked if his mother ever did anything else to his body, G.L. replied, "Nope. Not at all." The interviewer again indicated that G.L. had answered dozens of questions sufficiently to end the interview, so she asked if there was anything "we had talked about that you wanted to let me know anything more about." G.L. responded, "no." At this point, the interviewer removed G.L. from the room for a second time to communicate with CATANIO and COCHRANE.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

38.    COCHRANE and CATANIO again conspired during the second "break" to further intimidate and manipulate the 9-year-old witness by subjecting G.L. to prolonged and exhausting interrogation over the objections of G.L. and his father. Defendants sent the interviewer back to speak with G.L. a third time because none of the statements previously obtained from G.L. during the first hour of his interrogation constituted abuse.

39.    On information and belief, COCHRANE and CATANIO instructed the interviewer to continue harassing and questioning G.L. until his mother could be charged with additional crimes. Throughout the CPS SAFE Center Interview, CATANIO prevented Robb from being with G.L. and/or leaving with his children despite numerous requests from G.L. and Robb to leave.

40.    After the second "break," the interviewer returned and asked G.L. *forty* more questions prepared by CATANIO and COCHRANE. G.L. explained that the oldest age at which he took a shower with his mom was 5 years old. The interviewer asked invasive and repetitive questions of G.L. about his mother washing his private areas with soap at 5 years old, then asked "How did that make you feel when that happened?" G.L. replied, "Not really uncomfortable but now that I think about it, it makes you feel uncomfortable." This statement by G.L. – that his mother's conduct appeared to make *the interviewer* "uncomfortable" many years later – was the supposed "gotcha" moment that CATANIO and COCHRANE later claimed was the basis for saying that G.L. had "disclosed abuse"! The interviewer asked whether there were any questions she forgot to ask or that G.L. wants to talk about, and G.L. replied "no." Once again, the interviewer appeared to be under the impression that the CPS SAFE Center Interview should conclude. G.L. was removed from the *room for a third time* while the interviewer communicated with CATANIO and COCHRANE.

41.    On information and belief, on the third "break" from G.L.'s CPS SAFE Center Interview, COCHRANE and CATANIO again instructed the interviewer to continue harassing and questioning G.L. until his mother could be charged with additional crimes. Dissatisfied that G.L. could not be tainted, COCHRANE and CATANIO sent the interviewer back again to badger G.L. into confirming that he was molested – to no avail.

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

42.     The interviewer returned for a fourth time and asked G.L. a dozen more questions, including whether "at any time did anything ever go inside of the hole when your mom would wash your back private?" G.L. responded, "no." G.L. complained in his sweet 9-year-old way about the length and intrusiveness of the CPS SAFE Center Interview by asking at the end, "Is this one of the longer ones you've had?"

43.     The June 28, 2019 video CPS SAFE Center Interviews of G.L. and his sister I.L. were logged into evidence.[2]

44.     Throughout the School Interviews and CPS SAFE Center Interviews, G.L. and his sister were separated from each other but provided similar information to law enforcement. Both children denied being sexually abused by their mother but admitted to normal parental caretaking behavior and taking showers with their mother when they were younger. There was no substantive difference between the statements made by G.L. compared to those made by his sister I.L. during their conversations with CPS, the School Interviews, nor at the CPS SAFE Center Interviews. However, at the direction of CATANIO and COCHRANE, G.L.'s CPS SAFE Center Interview was of a much longer duration than his sister's CPS SAFE Center Interview.

**COCHRANE & SCHUBERT Amended Complaint to Allege G.L. Was Sexually Abused**

45.     Mr. & Mrs. L used their life savings, together with family contributions, to post Mrs. L's $750,000 bail on or about June 29, 2019.

46.     Four days later, on or about the morning of July 3, 2019, Mrs. L attended a pre-trial hearing wherein she was re-arrested and remanded back into custody. The First Amended Complaint (FAC) filed on even date added three new counts of violating Section 288(a) of the Penal Code and was signed by DDA COCHRANE on July 2, 2019 at the direction of District Attorney (DA) ANNE MARIE SCHUBERT. The FAC contains a number of factual allegations about G.L. which Defendants knew were not true. Each of the three new counts added to the FAC pertained to G.L, however none were supported by probable cause.

---

[2] Quotations from the CPS SAFE Center interview in this Complaint were taken from the video evidence of said interview that was used at trial in People v. Patricia Lane, Sacramento Superior Court Case No. 19FE010439.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

47. COCHRANE amended the FAC despite the fact that all evidence examined during the investigation of this matter indicated G.L. had not been victimized by any crime. Each of the eleven counts contained in the original criminal complaint against Mrs. Lane related to G.L.'s older brothers between 2002 through 2008, and carried a maximum sentence of 15 years to life. The three new counts in the FAC spanned from 2015 through 2018 and pertained to G.L.'s mother taking showers with G.L. Because the law had changed, the possible sentence was 25 years to life for each of the three new counts pertaining to G.L.

48. The FAC filed by COCHRANE at the direction of SCHUBERT also added a multiple victim sentence enhancement, which further increased the bail amount and possible sentence. Mrs. L's bail was increased to $2 million dollars, which was more than she could afford to pay.[3] Mrs. L was remanded back into custody as a consequence of CATANIO's lies about G.L.

49. COCHRANE, SCHUBERT and CATANIO conspired to add three new charges to the FAC pertaining to G.L. knowing that those charges were not supported by probable cause for the improper purposes of increasing Mrs. L's bail and forcing her to fight the charges in custody. This conspiracy was intended to and did weaken Mrs. L's defense.

50. Neither COCHRANE, SCHUBERT, nor CATANIO disclosed the existence of the School Interview recordings to Robb, nor did they ever produce the audio recording(s) of the School Interviews upon multiple pre-trial requests from Mrs. L's criminal defense attorney.

**G.L.'s Aunt in Law Enforcement Denied G.L.'s Abuse to CATANIO**

51. On or about the afternoon of July 3, 2019, G.L.'s maternal aunt who had previously spoken to COCHRANE visited the Folsom Police station to speak with CATANIO and another Folsom Police Detective Triplet regarding the criminal case against G.L.'s mother.

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

---

[3] For context as to how exorbitant Mrs. L's bail amount was, it was four times the amount set for a suspect in the largest mass-shooting in Sacramento history Daviyonne Dawson; Dawson was released on a $500,000 bond by Sacramento Superior Court on April 6, 2022 after six people were killed and twelve injured by extreme gun violence. Mrs. L's bail was increased from $750,000 to $2 million because COCHRANE and CATANIO falsely insisted that a mother showering with G.L. when he was 5 years old constituted sexual abuse, and because CATANIO fabricated allegations at the preliminary hearing that G.L. had been anally penetrated.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

CATANIO audio recorded the interview wherein G.L.'s aunt again expressed grave concerns about the credibility of the allegations made by G.L.'s older brothers.

52. Like DDA COCHRANE, CATANIO was similarly informed by G.L.'s aunt that G.L.'s older brothers had credibility issues, drug addictions, and motives to lie.

53. CATANIO proceeded to inform G.L.'s aunt that notwithstanding the drug and credibility issues with them, that would not explain why G.L. had "made a disclosure" during his CPS SAFE Center Interview. CATANIO intentionally misrepresented to G.L.'s aunt that G.L. had accused his mother of sexually abusing him in an effort to taint the testimony of yet another witness. For example, CATANIO falsely stated during the audio-recorded interview with G.L.'s aunt that:

> "the description that [G.L.] gave during his interview- was not 'mom was helping me with one thing or another.' Okay, it was an hour long, nearly, interview, very descriptive, Um, and we don't- ah, we're parents. I'm a parent. I get the difference between wiping your kid or your kid telling you their crotch hurts or penis hurts or you having to look at their private area and sometimes help them wipe areas where you normally wouldn't. I get it. I'm a parent. Um, but when a child is describing something more than that, *far beyond that*, um any adult would know is inappropriate contact. That's where *these* charges stem from, and that where we're at with [G.L.]. I mean, to be honest with you, I didn't expect anything at all in talking with him. I really didn't, um so what was described was not 'mom was helping me out.'"

54. G.L.'s aunt responded to CATANIO that, "G[.L.] and I[.L.] are staying at my house right now and the last thing they said to me before I drove down here was 'give my mom a big hug. We're so glad she's out of jail.'…G[.L.] was very concerned about [his mother] Patti, wanting her to get out." CATANIO retorted, "What motivation would G[.L.] have in making a disclosure?" Detective CATANIO first lied to G.L.'s aunt that G.L. had reported sexual abuse, but after she did not believe that lie, CATANIO doubled down by indirectly accusing the 9-year-old G.L. of lying!

55. Throughout the July 3, 2019 exchange with G.L.'s aunt, CATANIO repeatedly attempted to mislead her into believing that G.L. had reported during the CPS SAFE Center Interview that his mother had been touching him in an inappropriate sexual manner. In truth, G.L. had merely stated that he had taken showers with his mother on occasion. CATANIO nevertheless insisted and can be heard on the audio recording saying:

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

"<u>Why would G[.L.] make an allegation?</u> Um, what would he have to gain? Why would he do it? And I just don't understand. I guess that's the part from me where even if you removed all this other stuff. And, I get it. <u>They've [G.L.'s brothers] got some, sounds like, what you're describing, some substance abuse stuff, maybe some mental health stuff, a whole history of things. But we have a 9-year old boy that none of that has existed with. Um, that has now made a disclosure of things that are still happening. Why would he do that</u>?'"

The entirety of this statement by CATANIO was **fabricated.** Moreover, CATANIO inadvertently admitted that she needed G.L. to bolster her weak case because his brothers had major credibility issues – including drug use, mental health problems and lying. CATANIO and COCHRANE did not know those credibility issues with G.L.'s brothers would later be excluded from evidence at Mrs. L's criminal trial, so they tried to manufacture the perfect victim by falsely insisting that G.L. had also reported sexual abuse.

56.    G.L.'s aunt provided CATANIO with the names and contact information of at least four witnesses who could attest to the veracity of her statements. Despite another member of law enforcement encouraging CATANIO to contact material witnesses, CATANIO did not make a single telephone call nor attempt to speak with any of the witnesses identified by G.L.'s aunt. At COCHRANE's direction and pursuant to the policies established by SCHUBERT, CATANIO intentionally failed to conduct a reasonable investigation into the facts because they did not want to find anything exculpatory that could undermine their case against G.L.'s mother.

57.    Neither COCHRANE nor CATANIO seriously entertained the alternate theory posed by G.L.'s aunt – who was a member of law enforcement with a close relationship to almost every person involved in the criminal case.  At COCHRANE's behest, CATANIO was too busy disparaging G.L. and putting words into his mouth to consider the possibility that no crime had been committed.

//

**<u>CATANIO & COCHRANE Tainted Witnesses & Lied About G.L. Disclosing Abuse</u>**

58.    When witnesses and people familiar with the family did not believe that Mrs. L was a child molester, CATANIO and COCHRANE executed their defamatory scheme to convince them that G.L. had independently corroborated the sexual abuse allegations his older brothers made against their mother.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

59.    CATANIO intentionally made false statements about G.L. to family members and third parties in order to make them believe G.L. had been victimized so they would turn against Mrs. L.

60.    CATANIO made a habit of tainting witness testimony in child abuse investigations because she herself was a victim of child abuse – which the CITY OF FOLSOM and SCHUBERT knew, authorized and encouraged.

61.    CATANIO and COCHRANE conspired to and did intentionally mischaracterize G.L.'s CPS SAFE Center Interview statements to convince multiple skeptics that G.L. had reported that his mother had sexually abused him. For example, on or about July 5, 2019, CATANIO falsely told Robb's mother and stepfather that G.L. had "made a disclosure" regarding his mother during his CPS SAFE Center Interview. CATANIO made this false statement to G.L.'s grandparents hoping that it would turn Robb's parents against Mrs. L – which it did.

62.    CATANIO also falsely informed G.L.'s maternal uncle that G.L. had alleged sexual abuse against his mother despite CATANIO's knowledge that G.L.'s uncle had a drug habit and lengthy mental health history. CATANIO and COCHRANE were previously advised that G.L.'s uncle had been battling severe drug and mental health issues since the Folsom Police Department arrested him in 2016 while he was under the influence of LSD. CATANIO, COCHRANE and SCHUBERT each had access to the arrest records and other files maintained by the District Attorney's Office and Folsom Police Department which demonstrated that G.L.'s uncle was a troubled young man with limited capacity who was likely schizophrenic. COCHRANE examined these documents and informed CATANIO and SCHUBERT of their contents.

63.    In furtherance of their defamatory campaign, DDA COCHRANE conspired with and encouraged CATANIO to mischaracterize G.L.'s CPS SAFE Center Interview and School Interview statements to G.L.'s uncle with knowledge that G.L.'s uncle was of unsound mind. CATANIO made statements to G.L.'s uncle that he needed to protect G.L. from being further abused by his mother and stated her opinion that Mrs. L had also "groomed" G.L.'s uncle at a

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

young age. CATANIO sought to convince a mentally ill young man that his nephew G.L. was being sexually abused when he was not, then further insisted to that same young man that he was in denial because he himself had probably also been "groomed" by G.L.'s mother.

64.     CATANIO similarly falsely informed G.L.'s brother(s) that G.L. had alleged sexual abuse against their mother in an effort to elicit allegations of similar abuse from G.L.'s brother(s). These misstatements formed the basis for G.L.'s brothers, uncle, and paternal grandparents thereafter launching a protective crusade related to G.L. which was unnecessary, unwanted, invasive and untrue. CATANIO's misstatements about G.L. also served as the impetus that turned family members against Mrs. L – including G.L.'s uncle and Robb's parents.

65.     On information and belief, CATANIO's witness tainting strategy to "divide and conquer" the nuclear family unit in this case was the exact same pattern she exhibited when she tainted witness testimony during her investigation into the O'Neel family in Folsom. Namely, CATANIO lied to members of the accused's family in an effort to turn them against the family member CATANIO was falsely accusing of abuse – just as she did to G.L.

66.     The CITY OF FOLSOM became aware of CATANIO's habitual witness tainting because the O'Neel family filed a government tort claim with the CITY OF FOLSOM on June 17, 2021. Attached hereto as Exhibit A and incorporated by reference herein is the O'Neel claim filed with the CITY OF FOLSOM on June 17, 2021 regarding CATANIO. The ensuing civil complaint filed by the O'Neel family in U.S. District Court on December 24, 2021 alleged that CATANIO told the children who were the subject of her criminal investigations that CATANIO had herself been a victim of child abuse, and that CATANIO's sibling had also been abused as a child.[4] The CITY OF FOLSOM had a duty to inquire whether CATANIO's self-proclaimed personal trauma poisoned her ability to faithfully execute her duty to the Constitution. Instead, the CITY OF FOLSOM adopted a policy and practice of keeping police personnel files free of any damaging information that could be used to impeach their police officer's credibility and/or

---

[4] *See* O'Neel et al v City of Folsom et al, 2:21-cv-02403-WBS-DB, ECF No. 1 at p. 9 filed December 24, 2021. CITY OF FOLSOM received a government tort claim from the O'Neel family on or about June 17, 2021. Ex. A at p. 1.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

bias as a witness. G.L. was deeply and personally affected by the CITY OF FOLSOM's culture of silence that protected and encouraged the Constitutional violations committed by its employees.

67.    As a direct consequence of the CITY OF FOLSOM's policy of concealment, CATANIO abdicated her responsibility to seek the truth and continued to intentionally make false accusations about the families that she was supposed to be investigating. The procedure of seizing children without a warrant or evidence was instituted by the CITY OF FOLSOM at the advice and with the consent of DA ANNE MARIE SCHUBERT.

### Protective Order Prohibited Contact Between G.L. and His Mom

68.    At the direction of DA SCHUBERT, DDA COCHRANE requested and obtained a "no contact" protective order from the Sacramento Superior Court prohibiting G.L. from having any telephone or other contact with his mother on or about July 2, 2019. Attached hereto as Exhibit B and incorporated by reference herein is the criminal protective order dated July 3, 2019 preventing George and his mother from having any contact through its expiration date of July 3, 2022. This no-contact order was based on CATANIO's mischaracterization of G.L.'s CPS SAFE Center Interview, which SCHUBERT and COCHRANE both knew did not constitute probable cause to believe G.L. had been sexually abused. SCHUBERT and COCHRANE knew that the counts pertaining to G.L. had been fabricated by CATANIO when they obtained the no-contact order.

69.    SCHUBERT, COCHRANE and CATANIO conspired to obtain the no-contact order in contravention of G.L.'s Constitutional rights to further their improper purpose of persuading G.L. that his own mother had abused him. SCHUBERT, COCHRANE and CATANIO used G.L. in their campaign to make his mother "public enemy number one" so that SCHUBERT could declare herself the protector and gain name recognition. More than two years passed before G.L. could see or speak with his mother from July 2, 2019 through October 18, 2021. No such protective order was requested by COCHRANE to prevent G.L.'s little sister from having contact with their mother.

### CATANIO & COCHRANE Fabricated Probable Cause; Silenced G.L. at Prelim. Hearing

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

70.    G.L. asked to speak at his mother's preliminary hearing on or about November 12, 2019 so that he could answer questions from the judge directly to clarify that he was not sexually abused by her. Defense counsel for Mrs. L argued that:

> G[.L.] would testify we would expect consistent with the statements that he has made that the contact that's at issue in this case has to do with the shower or showers, I should say that, Ms. [L] would take showers with G[.L.] and wash his body, including his groin area both front and back, that she didn't linger on those, that there was nothing sexual about that, that he didn't have – that he felt that he was just being showered, and that ended approximately when he was 7 when he was able to shower and take care of himself in that regard. We think that's affirmative evidence that negates the sexual intent component that's required for 288. It also in part impeaches [G.L.'s eldest brother] Christian. And it would also illuminate the fact that he says that he never observed any sort of sexual conduct between Ms. [L] and any of the other boys in this case. So we do think that he provides affirmative evidence for the purposes of the prelim.[5]

71.    At the behest and direction of DA SCHUBERT, DDA COCHRANE objected vigorously and prevented G.L. from testifying at the preliminary hearing on November 12, 2019 to bury their conspiracy. G.L. sat in the hallway of the Sacramento Superior Court waiting for his chance to speak truth to power. The Court inquired whether G.L.'s version of events had changed at all, noting that "It's my understanding its been consistent from his statements to law enforcement to the defense investigation." Defense counsel replied:

> G[.L.] has been interviewed at least twice and possibly three times by law enforcement and then twice by the defense. So his general story has not changed when he was originally interviewed. No charges were filed. And then he was interviewed again. And nothing really changed substantively about his testimony about what he said vis-à-vis having showers with his mom. But I think it's the tenure. And G[.L.], who's 9 at this point is an – 10 now – intelligent young man, very articulate, and I think the court's ability to assess what he says versus what's going to be relayed through a second-hand police officer by way of 115. I think it illuminates this very critical component because the conduct that we would see in a sexual conduct of intercourse or penetration or oral copulation or any of those things that one would say that conduct is clearly a sexual conduct. But washing and bathing a young child is not overtly sexual. It requires an inference. And I think G[.L.]'s testimony regarding what actually occurred and his ability to articulate to the court I think is important for that determination.[6]

72.    Because COCHRANE would not allow G.L. to speak, CATANIO instead falsely testified at the preliminary hearing that G.L.'s older brother Christian had reported seeing their

---

[5] Clerk's Transcript on Appeal, pg. 00144-00145, People v. Patricia Lane, Court of Appeal No. C094996.

[6] Clerk's Transcript on Appeal, pg. 00146, People v. Patricia L, Court of Appeal No. C094996.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

mother insert her finger into G.L.'s rectum while they were living at the "house on Brophy Drive." Unbeknownst to Judge Savage, there was absolutely NO record in any of the investigative reports of G.L.'s brother Christian ever making such an allegation, nor could CATANIO identify when or how she was supposedly informed of this incident. None of G.L.'s brothers were available to testify at the preliminary hearing, which meant that there was no opportunity to verify the veracity of CATANIO's claim that G.L.'s brother had reportedly seen G.L. sexually abused by their mother. The Court nevertheless denied Mrs. L's motion to reduce bail and allowed COCHRANE and SCHUBERT to proceed with the three new charges in the FAC pertaining to G.L.

73.    Ten-year old G.L. was never appointed an attorney, guardian ad litem or other representative throughout any of the proceedings, nor was that option ever given to G.L. or his father during the criminal investigation. DA SCUBERT, DDA COCHRANE and CATANIO knew that G.L. and his father Robb were not represented by counsel during the School Interview, CPS SAFE Center Interview, preliminary hearing or trial, and intentionally exploited that lack of counsel when they violated G.L.'s Fourth Amendment and Fourteenth Amendment rights.

74.    The entirety of the purported evidence amassed by CATANIO, COCHRANE and SCHUBERT to support the charges in the FAC that G.L. had been sexually abused by his mother was nil. Defendants nevertheless conspired to coerce, silence, defame and harass the young G.L. into falsely testifying that he had been victimized by a crime at the hands of his own mother all the way through Mrs. L's criminal trial in July of 2021. This was a violation of G.L.'s clearly established Constitutional rights.

75.    DA SCUBERT AND DDA COCHRANE used G.L. as a pawn to advance SCHUBERT's "tough on crime" image for the upcoming California Attorney General campaign despite G.L. repeatedly insisting that he had not been molested. DDA COCHRANE had knowledge that her direct supervisor – Sacramento District Attorney ANNE MARIE SCHUBERT – would be seeking higher office with a "tough on crime" platform. SCHUBERT developed a systemic practice and policy of encouraging Constitutional deprivations within the

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

District Attorney's Office in a marketing effort meant to showcase her prosecutorial prowess to the public.[7] This "win at all costs" mentality motivated SCHUBERT, COCHRANE and CATANIO when they unreasonably seized, detained, questioned, harassed, defamed and silenced G.L. over the objections of G.L. and his father Robb.

76.     COCHRANE and CATANIO knew of SCHUBERT's ulterior political motivations for seeking multiple felony charges against a female defendant when they agreed to fabricate probable cause that G.L. had been molested by his mother. SCHUBERT developed a systemic practice and policy within the Sacramento District Attorney's Office of fabricating probable cause and tainting witness testimony to favor the prosecution which COCHRANE and CATANIO implemented.

77.     CATANIO, COCHRANE and SCHUBERT conspired to and did improperly harass G.L., unreasonably question and detain G.L. over the objections of G.L. and his father, destroy the audio recording of G.L.'s School Interview, conceal the audio of Robb being threatened with seizure of his children by CATANIO at the CPS SAFE Center, intimidate and prevent G.L. from testifying at his mother's preliminary hearing, make untrue defamatory statements to third parties that Mrs. L had sexually abused G.L., and force G.L. to testify as a prosecution witness against his own mother – all with knowledge that they were violating Plaintiffs' clearly established Constitutional rights.

**Defendants Hindered Efforts to Retrieve Exculpatory Evidence of School Interview Audio**

78.     CATANIO claimed that the audio recording(s) of the School Interviews with G.L. and his sister I.L. were deleted from her computer by another unnamed member of the Folsom Police Department. The foremost "expert" within the Folsom Police Department responsible for information technology ("IT"), Defendant ROWBERRY, was supposedly consulted by CATANIO to determine whether the School Interview recordings which had been deleted by CATANIO could be retrieved.

---

[7]  SCHUBERT was unable to persuade the electorate of her competence and later suffered a humiliating defeat in the California Attorney General race in  June of 2022.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

79.     COCHRANE, CATANIO, and ROWBERRY instead conspired to permanently destroy any and all recording(s) and back-up copies of the exculpatory School Interviews wherein Plaintiff and his sister repeatedly told CATANIO that their mother had not sexually abused them. ROWBERRY, COCHRANE and CATANIO thereafter intentionally evaded defense investigators and other members of Mrs. L's defense team who made multiple attempts to retrieve the data from them. All of this was done by Defendants for the dual purposes of destroying evidence and frustrating justice.

80.     The destruction of the School Interview recordings by Defendants was intended to and did strengthen the prosecution's case against G.L.'s mother. The destruction of this evidence was particularly harmful because the School Interviews were the first contact CATANIO had with G.L. and his sister I.L., and demonstrate what G.L. explained in his CPS SAFE Center Interview: that it was CATANIO who first told G.L. that *she believed* G.L. had been "sexually assaulted" by his mother – not G.L. who disclosed abuse to CATANIO. In other words, the audio that proves CATANIO tainted witness testimony went mysteriously missing from both of the devices issued to CATANIO by the CITY OF FOLSOM (a cell phone and lap top) before the audio could be logged into evidence.

81.     In lieu of the School Interview recordings, COCHRANE instead produced an inadequate and undated one-page summary of the School Interviews drafted by CATANIO perfunctorily stating the children had denied abuse. DDA COCHRANE participated in the destruction of audio evidence at the behest and direction of DA SCHUBERT to secure convictions against G.L.'s mother in furtherance of SCHUBERT's political aspirations of becoming the next "tough on crime" Attorney General of California. Defendants destroyed the School Interview audio recording at the expense of G.L.'s Constitutional rights so that they could commit fraud upon the Court without leaving a trace.

82.     ROWBERRY, as CATANIO's senior officer who was responsible for IT within the CITY OF FOLSOM Police Department, refused to cooperate with Mrs. L's defense team during the investigation because he knew that CATANIO and COCHRANE destroyed audio evidence and used fabricated information to substantiate their claims that G.L. had been

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

sexually abused. ROWBERRY knew or should have known that deprivations of G.L.'s Constitutional rights were occurring when he was asked to retrieve audio recordings that CATANIO had deleted without adequate explanation from her department-issued cell phone and laptop computer. ROWBERRY had the experience and training to retrieve the audio of the School Interviews, however he would not return telephone calls from Mrs. L's defense investigators or take any steps to recover the data because CATANIO and COCHRANE had informed him of their conspiracy to withhold the audio files at all costs.

83.     SCHUBERT, COCHRANE and CATANIO knew they lacked the necessary probable cause to charge Mrs. L for the crimes pertaining to G.L. alleged in the FAC. However, COCHRANE and SCHUBERT were emboldened by the confidence that their decisions to withhold evidence and overcharge Mrs. L would have no consequence in Sacramento Superior Court.

84.     COCHRANE, SCHUBERT CATANIO, and ROWBERRY conspired to and did intentionally destroy the School Interview recordings, which were the most critical evidence collected by the prosecution during the entirety of their investigation against G.L.'s mother. Defendants wrongfully withheld and deleted the unblemished truth from the mouths of babes that was recorded closest in time to the alleged abuse. COCHRANE and SCHUBERT then capitalized on their destruction of exculpatory evidence by filing additional charges against G.L.'s mother for sexually abusing G.L. that they knew were not supported by probable cause.

**Defendants Concealed Audio of CATANIO's Threats to Seize G.L. From his Dad**

85.     The audio recording of CATANIO threatening to take Robb's children away just prior to the June 28, 2019 CPS SAFE Center Interviews was saved and logged as evidence by CATANIO, however COCHRANE did not provide it to the defense until Mrs. L's defense counsel identified and specifically requested it. Mrs. L's counsel noticed for the first time an entry within the same screenshot CATANIO provided to prove that her CITY OF FOLSOM computer had been wiped clean. In other words, the audio recording of CATANIO threatening to take G.L. away from his father Robb at the CPS SAFE Center would not have been

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

discovered by Mrs. L's defense team, but-for CATANIO's denial that the School Interview audio recordings existed.

86.    COCHRANE, CATANIO and SCHUBERT conspired to conceal this material evidence because CATANIO had improperly threatened to seize G.L. if his father did not consent to G.L. being interrogated. Defendants sought to conceal CATANIO and COCHRANE's Constitutional violations during the CPS SAFE Center Interviews and preserve SCHUBERT's image with voters in the upcoming California Attorney General election.

87.    COCHRANE and CATANIO conspired to and did wrongfully withhold the audio recording from the CPS SAFE Center of CATANIO threatening to take G.L. and his sister away from their father if Robb did not consent to the CPS SAFE Center Interviews. COCHRANE failed to produce the audio recording of CATANIO threatening Robb to take his children away during the discovery process of Mrs. L's criminal case because she knew that they lacked a warrant and exigent circumstances. However, CATANIO inadvertently informed Mrs. L's criminal defense team that an audio recording of Robb at the CPS SAFE Center existed when she sent a screenshot demonstrating that the School Interview recordings were inaccessible.

88.    It was only upon noticing reference to a previously undisclosed file name that Mrs. L's defense attorney specifically requested and obtained from COCHRANE the audio recording of CATANIO threatening to take Robb's children away. COCHRANE and CATANIO had conspired to conceal the audio recording of CATANIO threatening Robb at the CPS SAFE Center in the same manner that the School Interview audio recording was destroyed, however they were precluded from destroying the audio of Robb at the CPS SAFE Center by Mrs. L's defense attorney making a written discovery demand for the audio file.[8]

89.    CATANIO, COCHRANE, SCHUBERT and THE CITY OF FOLSOM knew that the systemic bias within Sacramento Superior Court would preclude Mrs. L's defense attorney from having an independent IT expert examine the cell phone and laptop issued to

---

[8] It is unknown whether ROWBERRY's discovery of this audio recording of CATANIO threatening to seize the children served as the tipping point which later prompted ROWBERRY to attempt to withdraw from the conspiracy to violate G.L.'s civil rights. The inquiry is irrelevant since ROWBERRY's later attempt to withdraw from the conspiracy did not include any affirmative act(s) taken by ROWBERRY to defeat the purpose of the conspiracy.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

CATANIO by the CITY OF FOLSOM; Defendants relied on this favoritism when establishing such practices.

**Pitchess Motion – CATANIO's History of Fabricating Evidence Concealed From Court**

90.     Mrs. L's criminal defense attorney filed a *Pitchess* motion regarding CATANIO on or about June 24, 2021 related to CATANIO's destruction of the School Interview audio evidence and tainting witness testimony about G.L. The *Pitchess* motion, a copy of which is attached hereto as Exhibit C and incorporated by reference herein, sought information regarding CATANIO's training, evidence handling, and any prior allegations of witness tainting.

91.

92.     CITY OF FOLSOM had previously received notice on that CATANIO had a history of tainting witness testimony with false statements and conducting illegal searches and seizures in child abuse cases. On or about June 17, 2021, which was before Mrs. L's *Pitchess* motion was filed and argued, a government tort claim alleging like conduct had been filed against CATANIO, THE CITY OF FOLSOM and the County of Sacramento by claimants Faun O'Neel and her minor children. The O'Neel claim involved facts that were shockingly similar to G.L.'s experience with CATANIO.

93.     COCHRANE, SCHUBERT, and CANEPA were thus on written, actual and constructive notice of CATANIO's history of tainting witness testimony because of the government tort claim that had been filed by the O'Neel family with CITY OF FOLSOM and County of Sacramento on June 17, 2021.                                                     ,

This

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

concealment and fraud upon the Court was part of the policies and practices established by the CITY OF FOLSOM and SCHUBERT.[9]

94.    At the direction of Sacramento Superior Court Judge Ernest Sawtelle, shortly after the *Pitchess* hearing on or about July 12, 2021, Mrs. L's criminal defense attorney emailed CATANIO to "retrieve these [School Interview] recordings from your phone, computer, iTunes or iCloud account." CATANIO was specifically advised in that email that time was of the essence, and she was asked to identify the IT expert within the CITY OF FOLSOM who had the expertise to retrieve the recording of G.L.'s School Interview. Both CATANIO and COCHRANE knew that Mrs. L's criminal trial was just days away, however at the direction of COCHRANE and the CITY OF FOLSOM, CATANIO intentionally refused to cooperate with Mrs. L's defense attorney. CATANIO would not respond to multiple emails and telephone calls seeking to retrieve the audio recordings of G.L.'s School Interview from the cell phone and laptop issued to her by the CITY OF FOLSOM, and further refused to identify ROWBERRY as the IT expert with the experience to retrieve the data. CATANIO was emboldened by the CITY OF FOLSOM's policy and practice of concealing *Brady* violations to protect its police officers. CANEPA's concealment of CATANIO's prior wrongdoing from the Court at Mrs. L's *Pitchess* motion underscored the lack of professionalism and candor exhibited by CITY OF FOLSOM employees who were entrusted with serving the public good. This deputized CATANIO with the authority to continue her spree of Constitutional violations.

**Criminal Trial Testimony – G.L. Denied Abuse For the Fifth and Final Time**

95.    After spending two years in jail, Mrs. L's criminal trial began in late July of 2021 during the COVID-19 pandemic. G.L. was 11 years old at the time. The jury watched the video of G.L's CPS SAFE Center Interview at trial and heard Plaintiff and his father testify.

96.    The jury did not have the benefit of hearing the audio recording of G.L.'s School Interview because CATANIO claimed the audio file could not be recovered by ROWBERRY

---

[9] As previously stated, the government tort claim filed by the O'Neel family was denied by the CITY OF FOLSOM and later resulted in the filing of a complaint against CATANIO and CITY OF FOLSOM in the U.S. District Court Eastern District of California on or about December 24, 2021, identified as *O'Neel et al v. City of Folsom et al,* Case No. 2:21-cv-02403-WBS-DB.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

from CATANIO's computer hard drive or cell phone after being supposedly erased by another CITY OF FOLSOM employee. Out of at least ten interviews recorded by CATANIO in Mrs. L's case, the exculpatory School Interviews were the only two recordings that conveniently vanished from evidence.[10]

97.    On information and belief, CATANIO, COCHRANE, SCHUBERT and ROWBERRY continued to withhold the School Interview throughout Mrs. L's trial into August of 2021 because the audio recording was exculpatory as to the allegations against G.L.'s mother regarding G.L. and because it proved CATANIO improperly tainted witness testimony. Still two years into the prosecution of G.L.'s mother, Defendants refused to provide exculpatory evidence regarding G.L. despite their Constitutional obligation to provide this information.

98.    CATANIO falsely testified at Mrs. L's trial in July of 2021 that ROWBERRY had indicated he was not familiar enough with Apple products to retrieve the School Interviews from CATANIO's department issued laptop. During CATANIO's testimony at trial, ROWBERRY was again contacted by Mrs. L's defense investigator in July of 2021 to determine whether the School Interview audio recordings could be retrieved, however ROWBERRY intentionally refused to accept or return his telephone calls. This is consistent with ROWBERRY and CATANIO previously refusing to participate in the recovery of the School Interview recordings throughout the previous two years of the criminal investigation.

99.    CATANIO and ROWBERRY had already worked together on multiple assignments, including both of them testifying at the same evidentiary hearings in other cases. CATANIO therefore knew that ROWBERRY had extensive computer forensic training and was qualified as an expert in forensic computer extractions. For example, ROWBERRY had previously extracted data from a suspects' Apple product(s) at the request of CATANIO and had even testified about his expert qualifications retrieving data from Apple devices for CATANIO's other assignment(s). CATANIO therefore knew ROWBERRY was a computer

---

[10] The audio recording of Robb at the CPS SAFE Center being threatened by CATANIO was also mysteriously missing for a prolonged time, however it was somehow recovered upon Mrs. L's defense attorney's discovery demand. ROWBERRY possesses the IT skills necessary to recover all of the audio files in question and did recover the audio file of CATANIO threatening Robb to seize G.L. at the CPS SAFE Center. It is thus possible that the School Interview recordings may still be retrieved if an IT expert were granted access by CITY OF FOLSOM.

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

forensic expert with experience retrieving data from Apple devices at the time of her false trial testimony that the School Interviews could not be retrieved because of ROWBERRY's incompetence with Apple products.

100. Moreover, CATANIO and ROWBERRY's illegal search and seizure tactics in other cases demonstrate that the botched investigation into Plaintiff's mother was not unique. A pattern and practice of Fourth Amendment violations within the CITY OF FOLSOM has been sanctioned and encouraged by SCHUBERT and the Sacramento County District Attorney's Office over the course of many cases, including at least two other cases involving CATANIO: the O'Neel case and the Gregory Harms case. Sacramento District Attorney SCHUBERT exerted undue pressure on CITY OF FOLSOM detectives to violate Constitutional norms, which the CITY OF FOLSOM adopted as a policy and practice within its Police Department.

101. During the trial of G.L.'s mother, CATANIO admitted on cross-examination that at the direction of DDA COCHRANE and counsel for the CITY OF FOLSOM, she intentionally refused to cooperate with Mrs. L's defense investigator and defense counsel to retrieve the Plaintiff's School Interview recording.[11]

102. During cross-examination, CATANIO also affirmed that she had previously testified at the preliminary hearing and included in her written narrative that G.L.'s eldest brother Christian had told CATANIO "When we were living on Brophy Drive in Sacramento I witnessed [Mrs. L] stick her fingers up Bob and G[.L.]'s anus. I also witnessed her grabbing their testicles." These statements supposedly formed the basis for the investigation pertaining to G.L. However, CATANIO could not explain the glaring discrepancies with this wild accusation: Christian had moved out of the family home in the spring of 2008 before Plaintiff was born in the fall of 2009 and never lived at the Brophy Drive home where the rest of Plaintiff's family moved into in the summer of 2011. Moreover, Christian testified under oath at Mrs. L's trial that he had never witnessed his mother sexually abuse any of his brothers. Christian did not testify that he ever made any such statement to CATANIO about witnessing G.L. being abused.

---

[11] Reporter's Transcript on Appeal, pg. 1471-1473, <u>People v. Patricia L</u>, Court of Appeal Case No. C094996.

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Mrs. L had no opportunity to cross-examine Christian or either of G.L.'s other brothers during the preliminary hearing in 2019 until they testified at trial in 2021.

103. When CATANIO was pressed by defense counsel under oath at trial in 2021, "Isn't it true that Christian never said that he ever saw [Mrs. L] put her finger in anybody's anus?" CATANIO conceded her prior fabrication for the first time by replying, "I don't know." Again, CATANIO was asked whether that would be an important statement in a sexual assault investigation, which would alert the DA to what kind of charges should be filed. CATANIO skirted the questions thanks to COCHRANE's objection, but she was eventually pinned down. CATANIO utilized more than half an hour of silence in open court to review the transcripts of her interview(s) with G.L.'s older brother(s) while the jury awaited her explanation. CATANIO could not identify at trial when or how she was told that Christian witnessed their mother stick her finger into G.L.'s rectum. The jury sat in silence while CATANIO rifled through documents for thirty minutes, unable to back-up her lie from the preliminary hearing in 2019 that G.L.'s brother Christian had reported to CATANIO that he witnessed G.L. being digitally penetrated in the anus by their mother.

104. Mrs. L's defense counsel asked CATANIO "So you've looked through the entire transcript. You don't see anything about Christian saying he ever saw his mother stick her fingers in the anus of G.L., correct?" CATANIO responds, "Not in the transcript, no." CATANIO had falsely memorialized graphic details about G.L. being sexually abused by his mother during Mrs. L's preliminary hearing so that CATANIO's pre-trial report(s) would shock the conscience and result in a dramatic bail increase. Yet at trial, CATANIO was unable to provide one scintilla of evidence of any such horrific crimes committed against G.L.

105. At the behest of COCHRANE, CATANIO fabricated these details about rectal penetration at the preliminary hearing and in her report knowing that G.L.'s brother Christian made no such statement. Christian stated under oath at trial that he never saw any of his brothers sexually molested in the house.[12] Yet CATANIO had already perjured herself at the preliminary hearing in 2019 at COCHRANE's request in an effort to connect G.L. to crimes that never

---

[12]   Reporter's Transcript on Appeal, pg. 848-49, <u>People v. Patricia L</u>, Court of Appeal No. C094996.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

happened. SCHUBERT encouraged them to do so in order to secure convictions against Mrs. L. It was not until Mrs. L's criminal trial in July of 2021 that G.L. or his parents could have discovered that CATANIO lied under oath at the preliminary hearing in 2019 about G.L.'s brother Christian reporting to her that he had seen their mother abuse G.L. Until CATANIO's admissions at trial and the cross-examination of G.L.'s brothers in 2021, G.L. and his parents reasonably believed that G.L.'s brother Christian had lied to police about witnessing abuse, not that Detective CATANIO had lied at the preliminary hearing about Christian reporting such abuse.

106. COCHRANE subpoenaed G.L. as a prosecution witness and forced him to testify at his mother's trial in July of 2021 regarding the allegations of sexual abuse CATANIO had fabricated about G.L. Over the course of two days, G.L. testified under oath about showering, his CPS SAFE Center Interview, and the "stern looks" COCHRANE made in court when G.L. was talking. G.L.'s trial testimony indicated that the 11-year-old witness perceived that COCHRANE was trying to intimidate him and manipulate his responses on the witness stand by glaring at him with "stern looks" in court. This was a public display of the same covert policy and procedure employed by CATANIO to intimidate and manipulate G.L.'s statements during the School Interview and CPS SAFE Center Interview throughout the course of the investigation. To make a public example out of G.L.'s mother at the request of DA SCHUBERT, COCHRANE and CATANIO intimidated and attempted to improperly influence G.L. from the outset of the criminal investigation all the way through G.L.'s trial testimony in July of 2021.

107. G.L. stood like a rock at his mother's trial and told the same story that he had professed since he was first questioned three years earlier in 2018 – that he was not sexually abused by his mother. When asked how old G.L. was when he last snuggled with his mom in bed, he replied "I would probably do it now." This was G.L.'s heartbroken reaction after more than two years of forced separation from his mother as a result of the no-contact protective order that COCHRANE and CATANIO obtained under false pretenses.

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

108. At trial, CATANIO was asked to clarify her prior statements to G.L.'s paternal grandmother during the investigation wherein CATANIO indicated that "G.L. had made a disclosure." CATANIO had the benefit of her investigation notes, transcripts and case file available to her while testifying. Yet she could not identify any legitimate law enforcement purpose for telling G.L.'s grandmother that G.L. had "disclosed" abuse. Nor could CATANIO identify any legitimate law enforcement purpose for telling G.L.'s aunt that whatever event(s) G.L. had "disclosed" to law enforcement were still happening to him. The rational explanation which CATANIO refused to admit was that she was trying to turn G.L.'s family against his mother by mischaracterizing what G.L. reported – just as CATANIO attempted to do in the O'Neel case.

109. When asked under oath whether CATANIO was trying to improperly persuade G.L.'s aunt that G.L. had been abused when he had not, DDA COCHRANE rescued CATANIO from answering with an "argumentative" objection.

110. CATANIO even admitted in her July 2021 trial testimony that during the School Interview, "I told G[.L.] that one of his brothers said that they saw his mother do something inappropriate to his body." Yet CATANIO could not identify a single report or shred of evidence at trial to support her assertion that G.L.'s brother had reported witnessing any such abuse.

111. When CATANIO was asked at trial who had reported seeing G.L. digitally penetrated and when, she could not identify the date or manner of any such accusation that was ever reported to her despite having all investigative materials available during her testimony.

**Jury Unanimously Found G.L.'s Mother "Not Guilty" of Sexually Abusing G.L.**

112. On August 19, 2021, the jury found Mrs. L "not guilty" of all three charges pertaining to G.L. which had been added to the FAC by COCHRANE and SCHUBERT based on misrepresentations made by CATANIO. No witnesses could substantiate the information contained in the FAC regarding G.L. at trial – including CATANIO. There was no eyewitness testimony, DNA, or physical evidence that in any way indicated G.L. was sexually abused by his mother.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

113.    The three claims in the FAC pertaining to G.L. were based on information already known by CATANIO, SCHUBERT and COCHRANE to be false at the time such charges were brought.

114.    Substantial evidence regarding G.L.'s brothers' drug use, mental health problems, motivations for lying, and how CATANIO tainted their testimony was excluded from Mrs. L's criminal trial. G.L.'s mother was found guilty of four of the fifteen counts that she was ultimately charged with. Pursuant to SCHUBERT and COCHRANE's request, on October 8, 2021, Mrs. L was sentenced to the maximum possible prison sentence – sixty years to life. Mrs. L is appealing those convictions on the basis of erroneous evidentiary exclusions. Attached hereto as Exhibit E and incorporated by reference herein is Mrs. L's opening brief filed in the Third Appellate District on September 1, 2022 for Case No. C094996.[13]

115.    Because of the no-contact protective order that COCHRANE, CATANIO and SCHUBERT fraudulently obtained against G.L. and his mother, G.L. was not able to see or speak with his mother again until late October of 2021 when the protective order was finally terminated as to G.L. All of G.L.'s contact with his mother since October of 2021 has been from behind security glass or by telephone, which hampers G.L.'s ability to rebuild his parental bond with his mother in a meaningful way.

### Defendants Botched the Criminal Investigation

116.    Defendants relied solely on the fabricated information provided by CATANIO and ignored exculpatory evidence in their possession which clearly indicated that G.L. had not been victimized by any crime. Defendants never produced any physical evidence or eyewitness testimony that G.L. was victimized by a crime in any way, yet they brought criminal charges against G.L.'s mother based solely on their own unsupported and unsubstantiated statements.

---

[13] Counsel for CITY OF FOLSOM argued at the hearing on G.L.'s petition to bring a late government tort claims held in Sacramento Superior Court on September 20, 2022 that it would be "unfair" to expect him to be familiar with Mrs. L's underlying criminal case for purposes of determining when the state law cause of action for abuse of process accrued unless G.L. filed a request for judicial notice pertaining to each transcript at issue. Without citing any supporting authority, CITY OF FOLSOM's counsel further argued that this case is an "impermissible collateral attack" upon the criminal proceedings. Exhibit E demonstrates that the civil rights violations and claims alleged against CATANIO and COCHRANE in this case are unrelated to the myriad of valid appellate issues briefed therein.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

117.   CATANIO, COCHRANE and ROWBERRY failed to timely produce exculpatory evidence throughout the pendency of the criminal proceedings in violation of their Brady responsibilities, then concealed critical evidence of the School Interview which proved that G.L. had no connection to any crime. More importantly, their destruction of the School Interview audio recordings was intended to and did destroy evidence of what G.L. later disclosed in the CPS SAFE Center Interview – that CATANIO had sought to taint G.L.'s testimony by telling him that his brother had witnessed him being "sexually assaulted" by their mother at age 5.

118.   CATANIO and ROWBERRY – at the direction of the CITY OF FOLSOM and pursuant to its policies – blocked all of Mrs. L's defense efforts to attempt to recover the School Interview recordings using a computer forensics expert. ROWBERRY and CATANIO intentionally ignored multiple calls and requests from Mrs. L's defense team regarding retrieval of the School Interview audio at the direction of COCHRANE and SCHUBERT.

119.   The combined actions of all Defendants form the basis for Plaintiff's claims and the damages he sustained. This includes, but is not limited to, how they: fabricated crimes committed against G.L.; coerced and manipulated witnesses; illegally seized G.L.; concealed evidence proving the falsity of the crimes against G.L.; withheld the recording of CATANIO threatening G.L.'s father with removal of his minor children if he did not consent to an illegal search and seizure of G.L. and his sister; destroyed G.L.'s School Interviews; obtained/enforced a no-contact order between G.L and his mother under false pretenses which prevented G.L. from having contact with his mother for over two years; withheld material and responsive information regarding CATANIO at the Pitchess hearing in 2021 to conceal CATANIO's documented history of fabricating evidence and tainting witness testimony.

120.   The Defendants agreed amongst themselves and with other individuals to act in concert in order to deprive G.L. of his clearly established Constitutional Rights under the Fourth and Fourteenth Amendments to be free from unreasonable search and seizure and deprivation of liberty without due process of law. Defendants were badge-carrying law enforcement officers

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

who exercised power possessed by virtue of state law and made possible only because they were clothed with the authority of state law.

121. The policy and customs of the CITY OF FOLSOM and Sacramento County District Attorney SCHUBERT – who employed the individual Defendants – were the moving forces behind Defendants' Constitutional violations against G.L. The management, operation, oversight, training and policies associated with the investigation of child sexual abuse and other felony investigations by the CITY OF FOLSOM Police Department and Sacramento County District Attorney prioritized obtaining convictions over Constitutional safeguards.

122. Due to the failure of adequate monitoring, oversight, policies and procedures in the CITY OF FOLSOM Police Department and by the Sacramento County District Attorney, G.L. was falsely accused of being sexually molested, separated from his parent(s), and forced to testify against his own mother in July of 2021. Unfounded criminal charges were intentionally brought against G.L.'s mother which were ultimately terminated in G.L.'s favor.

123. With proper training, monitoring and oversight, the Constitutional rights violations orchestrated by law enforcement in this matter would not have occurred. The exculpatory School Interviews should have been provided by ROWBERRY at the time criminal charges related to G.L. were brought against his mother. The CITY OF FOLSOM had an opportunity to redeem itself in July of 2021 when CATANIO's personnel file should have been fully disclosed to the Sacramento Superior Court by CANEPA during the *Pitchess* motion filed by Mrs. L's defense attorney. This would have spared G.L. from having to testify against his mother for charges that were not supported by probable cause which CATANIO had fabricated. As a pattern and practice, CATANIO, COCHRANE, the CITY OF FOLSOM, and DA SCHUBERT used false statements and illegal searches/seizures to improperly influence other witnesses in this and other unrelated criminal cases. Defendants ignored numerous opportunities all the way through August of 2021 at Mrs. L's criminal trial to produce the exculpatory audio evidence of G.L.'s School Interview to the Superior Court, provide CATANIO's full personnel file with the O'Neel claim, and withdraw the groundless charges against Mrs. L pertaining to G.L.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

124.   COCHRANE and SCHUBERT advised CITY OF FOLSOM Police Detectives CATANIO and ROWBERRY during the investigative phase of the criminal case, acted in an investigative capacity throughout the case, amended the FAC before having probable cause to arrest G.L.'s mother, held G.L. in a detention facility against his will and the will of his father Robb, and acquired false statements from witnesses for use in a criminal prosecution. All of those actions fell outside of their official role as prosecutors and thus undermined any prosecutorial immunity COCHRANE and SCHUBERT may otherwise enjoy.

125.   In furtherance of their conspiracy, Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.   fabricating statements and information for the purpose of unlawfully circumventing probable cause requirements;

b.   unlawfully seizing and detaining G.L. during the CPS SAFE Center Interview and threatening his father to remove G.L. from his care in violation of the Fourth and Fourteenth Amendments;

c.   withholding and destroying material exculpatory evidence from Mrs. L's defense counsel and the Court regarding G.L. and CATANIO;

d.   wrongfully prosecuting G.L.'s mother for sexually abusing G.L. while knowing there was no probable cause that G.L. had been abused;

e.   attempting to manufacture witness statements from unreliable informants based on CATANIO's false statements that G.L. had accused his mother of sexual abuse; and

f.   obtaining and enforcing a no-contact protective order under false pretenses which prevented G.L. from seeing or speaking with his mother for more than two years through October of 2021.

126.   G.L was subjected to psychological pressure and additional stress caused by Defendant's illegal acts. Defendants damaged G.L.'s life, time, health, development, bonding, and childhood. G.L. suffered the loss of his dignity for over two years while his father Robb was powerless to protect him from Defendants. G.L. was belittled and treated as a victim over

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

his and his father's repeated objections. G.L. was isolated from his family because of the bad faith and unmeritorious motives of CATANIO, COCHRANE, SCHUBERT, and ROWBERRY. G.L.'s mother was remanded to custody and compelled to defend against fabricated claims because of Defendants' illegal conduct and slanderous allegations regarding G.L. G.L.'s liberty was restrained as a result of the no-contact protective order and the custodial interrogation at the CPS SAFE Center. G.L. was subjected to more stress than any child should be forced to endure. Defendants acted with malice and reckless disregard for G.L.'s rights when they wrongfully obtained the no-contact order against G.L. Defendants never provided G.L. or his father with notice and an opportunity to be heard regarding the no-contact order or any other part of the investigation and trial. No emergency circumstances ever existed to justify Defendants' acts.

127. Defendants abused their power by labeling G.L. a sexual assault victim before an allegation had been made, let alone an investigation been conducted and a trial occurred. Law enforcement is supposed to act fairly and refrain from arbitrarily labeling people as criminals or victims to avoid unjust penalties. Defendants violated their duties throughout the course of the criminal investigation with respect to G.L. because they prioritized obtaining convictions and vindicating their personal traumas over seeking the truth.

128. Not only did G.L. have his life and liberty restrained as a result of the actions of Defendants, but G.L. suffered from extreme guilt and anxiety while G.L.'s mother spent more than two years in jail for crimes against G.L. which he knew that she did not commit. As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, G.L sustained injuries and damages which continue to date and will continue into the future, including: physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; legal expenses; humiliation, indignities and embarrassment; degradation; permanent loss of natural and psychological development; and restrictions on his freedoms, for which he is entitled to monetary and injunctive relief.

//

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

129. These injuries and damages to G.L. were foreseeable to Defendants at the time of their acts and omissions because they violated G.L.'s clearly established Constitutional rights. All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, and/or with bad faith, and said acts meet all of the standards for the imposition of punitive damages.

130. As a direct and proximate result of the conduct of Defendants described above, G.L. has been denied his Constitutional and statutory rights as stated below and has suffered and continues to suffer mental and emotional distress, humiliation, embarrassment, discomfort and anxiety.

131. CATANIO, COCHRANE, CITY OF FOLSOM and SCHUBERT's policies, practices, conduct and acts alleged herein have resulted and will continue to result in irreparable injury to Plaintiff, including but not limited to further violations of his statutory and constitutional rights. These future injuries include, but are not limited to, the possibility that G.L. and/or his little sister I.L. may be seized/removed from their parent(s) again without cause and that Defendants continue to defame G.L. to family members and third parties under the guise of acting as law enforcement officers. Plaintiff has no plain, adequate or complete remedy at law to address the wrongs described herein. Plaintiff therefore seeks injunctive relief restraining Defendants from continuing to engage in and enforce the unconstitutional and illegal policies, practices, conduct and acts described herein. G.L. seeks an injunction prohibiting the CITY OF FOLSOM from ever re-employing CATANIO and prohibiting the SACRAMENTO DISTRICT ATTORNEY'S OFFICE from ever re-employing COCHRANE, as well as an injunction prohibiting the SACRAMENTO DISTRICT ATTORNEY, the CITY OF FOLSOM and their respective employees from continuing to conceal CATANIO's history of wrongdoing from any court of law, G.L., and/or the public. Without such injunctive relief, it is likely that prospective harms will be committed against G.L. and/or his little sister I.L. by Defendant(s) during the course of their mother's criminal appeal and any subsequent re-trial.

//

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

132.    G.L. was treated differently than his similarly-situated younger sister on the basis of his gender. Defendants acted with discriminatory intent in violation of G.L.'s clearly established legal and constitutional rights. Defendants directly and proximately caused G.L.'s humiliation, mental pain and suffering. As a direct, legal and proximate result of Defendants' violations of Plaintiff's statutory, constitutional and common law rights, G.L. has been damaged in an amount to be proven at trial.

133.    At all times herein mentioned, Defendants had an obligation to comply with federal and state laws regarding gender discrimination. Defendants failed to meet these obligations with respect to G.L.

134.    Unless an injunction is obtained to prevent Defendants CATANIO, COCHRANE, SCHUBERT and the CITY OF FOLSOM from committing further Constitutional violations against G.L. and continuing to defame him, G.L. will be irreparably injured. Said Defendants continue to cause G.L. irreparable harm by their ongoing harassment and false insistence that G.L. requires protection from his mother. This includes, but is not limited to, G.L. currently being restricted to non-contact visitation with his mother at California Department of Correction & Rehabilitation facilities.

### FIRST CAUSE OF ACTION
### FOURTH AMENDMENT VIOLATION
### FOR FALSE ARREST AND IMPROPER SEIZURE OF A CHILD
### (Against Defendants CATANIO & COCHRANE)

135.    Plaintiff re-alleges and reincorporates each and every allegation contained in the Factual Allegations and all previous paragraphs, inclusive, as though fully set forth herein.

136.    The actions and omissions of the defendants CATANIO and/or COCHRANE deprived G.L. of his clearly established right to be secure in his person, house, papers and effects against unreasonable search and seizure as guaranteed by the Fourth Amendment to the United States Constitution by: forcing the minor Plaintiff G.L. to be questioned by Folsom Police, law enforcement and/or CPS on multiple occasions over the objection of G.L. and his father; threatening Robb with the forcible removal of his children if he did not acquiesce to G.L.'s interview at the CPS SAFE Center; and obtaining and enforcing a no-contact order under false

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

pretenses which prevented G.L. from seeing or communicating with his mother for over two years.

137. CATANIO and COCHRANE subjected G.L. to lengthy detention and interrogations without probable cause or reasonable suspicion to believe that any crime had been committed and prevented him from leaving the CPS SAFE Center. CATANIO and COCHRANE persisted with lengthy coercive interrogations of the minor G.L. over the objections of both G.L. and his father. Then they obtained and enforced a "no contact" protective order under false pretenses which prohibited G.L. from having any contact with his mother for over two years, which was a de-facto extension of their seizure of G.L.

138. Interrogations and seizures that disregard the Constitutional rights of children were a pattern and practice of both SCHUBERT and THE CITY OF FOLSOM – at whose behest CATANIO and COCHRANE acted.

139. As a direct and proximate result of Defendants' unlawful conduct, G.L. was injured and suffered significant deprivation of liberty, causing damages as detailed herein.

140. The right to familial association guaranteed under the Fourteenth Amendment is "clearly established" such that any reasonable law enforcement agent in Defendants' situation would know it is unlawful to remove a child from the care, custody, and control of his parents or to question, threaten, examine, or search a child in the absence of exigent circumstances without first obtaining a warrant to do so. Moreover, the right to familial association guaranteed under the Fourteenth Amendment to the United States Constitution was so clearly established that any reasonable law enforcement agent, including Defendants, would know that it is unlawful to continue to detain a child from the custody of his parent when the agent knows, or has reason to know, that there is no legal or factual basis for the continued detention. Likewise, the right of children to be free from unreasonable seizure was clearly established pursuant to the Fourth Amendment of the United States Constitution. G.L.'s rights were violated by his seizure, detention and prolonged interrogation. Defendants further knew that imposition of a no-contact protective order between a child and his parent which is intentionally obtained by law enforcement under false pretenses violates the Fourth and Fourteenth Amendments. Defendants'

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

acts were done in knowing violation of G.L.'s clearly established Constitutional rights, and without good faith.

141. Defendants CATANIO and COCHRANE, and each of them, had at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms, provides for, and does not violate the protections guaranteed Plaintiff under the United States Constitution, including the right to be free from unreasonable seizure and the rights to due process of law, privacy, family integrity, and familial relations.

## SECOND CAUSE OF ACTION
### FOURTEENTH AMENDMENT EQUAL PROTECTION VIOLATION
### (Against Defendants CATANIO & COCHRANE)

142. Plaintiff re-alleges and reincorporates each and every allegation contained in the Factual Allegations and all previous paragraphs of all previous Causes of Action in this Complaint, inclusive, as though fully set forth herein.

143. The actions and omissions of the Defendant CATANIO in threatening to remove the minor G.L. from his father's care without notice and an opportunity to be heard violated the due process clause of the Fourteenth Amendment to the United States Constitution. CATANIO and COCHRANE agreed jointly to seize G.L. from the care and custody of his father Robb without court authorization if his father did not consent to G.L. being interviewed at the CPS SAFE Center. At the time that said Defendants conspired to seize G.L., there was no warrant or court order, nor any imminent risk of serious bodily injury to G.L. within the time it would have taken Defendants to obtain a warrant to authorize the seizure. Mrs. L was in custody at the Sacramento County Jail at the time G.L. was seized from his father at the CPS SAFE Center and subjected to interrogation. Thus, Defendants had ample time to seek a court order authorizing seizure of G.L. had they truly feared for his safety.

144. At the time of the complained of events, G.L. had the clearly established constitutional right to be free from gender discrimination in law enforcement by police officers and to enjoy the equal protection of the laws.

145. Defendants CATANIO and COCHRANE had at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms,

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

40

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

provides for, and does not violate the protections guaranteed Plaintiff under the United States Constitution, including those under the Fourteenth Amendment, to include without limitation, the protection of parental rights, due process of law, equal protection of the law, the right to privacy, family integrity and the right to familial relations. The clearly established right of the family to remain together without the coercive interference of the awesome power of the state encompasses the reciprocal rights of both parent and child. Children have the Constitutional right to avoid dislocation from the emotional attachments that derive from the intimacy of daily associations with their parents. Moreover, Plaintiff had a clearly established right to equal protection under the law and the right to be free from disparate treatment by government agents based on his gender. Defendants knew or should have known of these rights at the time of the complained conduct s they were clearly established at the time.

146.    In subjecting G.L. to prolonged interrogation at the CPS SAFE Center, threatening the forcible removal of G.L. from his father's care if his father did not consent to G.L.'s interrogation, disparaging G.L. to his family members, filing the FAC without any probable cause to support the claims pertaining to G.L., lying to the Court about statements G.L.'s brother never made, and obtaining/enforcing the no-contact protective order against G.L. to prevent him from having any contact with his mother for more than two years, CATANIO and COCHRANE caused G.L. to suffer deprivations of his fundamental rights to liberty, due process of law, equal protection of the law, and to be free from unlawful searches, detentions and seizures. None of these same actions were taken against G.L.'s younger sister I.L. who was similarly situated, which underscores the unlawful discrimination on account of G.L.'s gender by subjecting him to Constitutional violations that his similarly-situated sibling of another gender was not subjected to. Defendants literally needed a "poster BOY" for their smear campaign against Mrs. L to bring credibility to their theory that she was a child molester, and G.L. fit the bill perfectly because he was just that – a boy.

147.    Plaintiff's gender was a motivating factor in the decisions to use unreasonable interrogation tactics and then maliciously label Plaintiff as a victim of sexual assault by his mother. Defendants' conduct was undertaken with the purpose of depriving Plaintiff of the equal

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

protection and benefits of the law, equal privileges and immunities under the law, and due process in violation of the Fourteenth Amendment and 42 U.S.C. § 1981.

148. Defendants knew or should have known of these rights at the time of the complained of conduct as they were clearly established at the time.

149. Plaintiff's procedural due process rights pursuant to the Fourteenth amendment were violated by the conduct of Defendants CATANIO and COCHRANE, both of whom were acting under color of state law when they violated Plaintiffs' civil rights by: detaining, interrogating, seizing, threatening to remove G.L. from the care of his father Robb without judicial authorization nor parental consent, and in the absence of exigent circumstances; lying to the Court under oath about the substance of the allegations pertaining to G.L.; and obtaining/ enforcing a no-contact protective order under false pretenses which prevented G.L. from having any contact with his mother for over two years until October of 2021.

150. CATANIO and COCHRANE committed these unconstitutional acts without proper justification or authority, without probable cause, and without any specific evidence to suggest that G.L. was in imminent danger of suffering serious bodily injury or death at the hands of his parents.

151. At the time of said detention, interrogation, and seizure of G.L., Defendants, and each of them, knew a parent-child relationship existed between the Plaintiff G.L. and his father Robb and mother Mrs. L, and that G.L. was entitled to the companionship and care of his parents.

152. Based solely on G.L.'s gender, CATANIO & COCHRANE failed to conduct a reasonable investigation into the facts prior to detaining and interrogating G.L., filed the FAC alleging crimes against G.L. they knew were not supported by probable cause, obtained a no-contact order as to G.L., and enforced the no-contact protective order between G.L. and his mother all the way through termination of the no-contact order in October of 2021.

153. Said Defendants thereby violated Plaintiff's rights to due process and equal protection of the law under the Fourteenth Amendment of the United States Constitution.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

154. CATANIO and COCHRANE corroborated, acted, and/or conspired to violate Plaintiff's civil rights. CATANIO and COCHRANE purposefully failed to seek and/or obtain a warrant, knowing that insufficient grounds or evidence existed to support such application and/or, as detailed below, as a result of unconstitutional policy, custom, or practice of never obtaining warrants prior to seizing, detaining and/or interrogating children.

155. As a direct and proximate result of CATANIO and COCHRANE's unlawful conduct, Plaintiff has suffered severe emotional injuries, embarrassment, grief, anguish, and other general and special damages and losses according to proof at trial. Plaintiff has also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those authorized by 42 U.S.C. section 1988, to an extent and in an amount subject to proof at trial.

156. CATANIO and COCHRANE acted with malice and with the intent to cause injury to Plaintiff or acted with a willful and conscious disregard of the rights of Plaintiff in a despicable, vile, and contemptible manner. Plaintiff is therefore entitled to recover punitive damages from CATANIO and COCHRANE, as permitted by law and as according to proof at trial, due to the wrongful conduct of said Defendants as herein alleged and to deter them and others from such conduct in the future. CATANIO and COCHRANE acted maliciously, willfully or with a reckless or wanton disregard for Plaintiff's clearly established Constitutional and statutory rights.

**THIRD CAUSE OF ACTION**
**CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS**
**IN VIOLATION OF 42 USC §1985**
**(Against Defendants CATANIO, COCHRANE, ROWBERRY, & SCHUBERT)**

157. Plaintiff G.L. re-alleges and reincorporates each and every allegation contained in the Factual Allegations and all previous paragraphs of all previous Causes of Action in this Complaint, inclusive, as though fully set forth herein.

158. The actions and omissions of Defendants CATANIO, COCHRANE, ROWBERRY and SCHUBERT by silencing G.L. at the preliminary hearing, concealing evidence pertaining to G.L. throughout the investigation and criminal trial in August of 2021,

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

and harassing, coercing, and defaming G.L., together with their conspiracy to deprive G.L. of his Constitutional right to equal protection of the laws, constitute an obstruction of the due course of justice, intimidating a witness, and deprivation of rights or privileges in violation of subdivisions (2) and (3) of 42 U.S.C. § 1985.

159.   In furtherance of their conspiracy to deprive Plaintiff of his equal privileges under the law, Defendants destroyed or withheld evidence of the School Interviews and fabricated statements regarding G.L. on the basis of his gender. Defendants did so for the purpose of strengthening their weak criminal case against G.L.'s mother because all of the other alleged conduct had occurred more than fifteen years prior. Defendants did not employ the same tactics against G.L.'s younger sister I.L. – such as prolonged interrogation, unsupported criminal charges and imposition of a no-contact protective order – because I.L. was a female and thus did not fit the prosecution's theory that Mrs. L was a child molester who preyed on young boys.

160.   This disparate treatment of G.L. on the basis of his gender without any rational basis caused personal injury to G.L. and deprived him of his rights and privileges as a citizen of the United States.

161.   The actions and omissions of CATANIO, COCHRANE, ROWBERRY and SCHUBERT in destroying and/or failing to preserve or produce material exculpatory evidence of G.L.'s School Interview that was timely and lawfully requested severely prejudiced G.L. and denied G.L. his liberty and equal protection of law. These actions and omissions were taken by said Defendants in furtherance of their conspiracy to deprive G.L. of equal protection of the law.

162.   As a direct and proximate result of Defendants' unlawful conduct, G.L. suffered the severe emotional anguish associated with a minor being deprived a relationship with his mother by unreasonable and improperly coercive government intervention. G.L. was forced to testify against his own mother by Defendants in July of 2021 because a young male victim fit their narrative; G.L. has suffered severe emotional injuries, embarrassment, ridicule, grief, and other damages and losses as described herein. G.L.'s liberty was restrained by the no-contact protective order that was knowingly obtained by Defendants without probable cause which prevented the minor G.L. from having any contact with his mother for over two years through

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

October of 2021.

163.    In addition, G.L. is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of these individual Defendants have been taken maliciously, willfully, or with a reckless or wanton disregard for G.L.'s clearly established constitutional and statutory rights.

**FOURTH CAUSE OF ACTION**
**JUDICIAL DECEPTION**
**(Against Defendants CATANIO, ROWBERRY, & CANEPA)**

164.    G.L. re-alleges and reincorporates each and every allegation contained in the Factual Allegations and all previous paragraphs of all previous Causes of Action in this Complaint, inclusive, as though fully set forth herein.

165.    The actions and omissions of CATANIO, ROWBERRY & CANEPA constitute judicial deception, including: alleging charges against G.L.'s mother in the FAC for sexually abusing G.L. without probable cause; fabricating horrendous stories to the Court that G.L. had been anally penetrated by his own mother when no such conduct had ever been reported; concealing CATANIO's history of witness tainting and evidence tampering from the Court during the *Pitchess* motion; making false, improper and defamatory communications to third parties that G.L. had "disclosed" that his mother had sexually abused him in order to taint the testimony of those witnesses; and obtaining and enforcing a no-contact protective order under false pretenses that prevented G.L. from having any contact with his mother for more than two years through October 18, 2021. Said Defendants deliberately or recklessly made false statements or omissions that were material to the finding of probable cause, and but-for their repeated and ongoing dishonesty: the FAC would not have been amended to allege that G.L. had been sexually abused; no protective order would have been imposed as to G.L.; Mrs. L would not have been remanded back into custody; G.L. would not have been forced to testify for the prosecution at his mother's trial in July of 2021; CATANIO would have been more effectively impeached before G.L. was forced to testify against his mother; and G.L. would not have been subjected to a fraudulently-obtained protective order that prohibited him from having contact with his mother from July 2, 2019 through October 18, 2021.

45

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

166. CATANIO harassed G.L., then fabricated charges against G.L.'s mother pertaining to G.L. with the ulterior motives and knowledge that there was no probable cause to support the three counts pertaining to G.L. in the FAC.

167. CATANIO intentionally prevented G.L. from testifying at his mother's preliminary hearing to conceal the lack of probable cause for the charges pertaining to G.L. that were added to the FAC based on CATANIO's fabrications. CATANIO initiated criminal proceedings without probable cause, with malice, and the proceedings were ultimately terminated in Plaintiff's favor.

168. CATANIO and ROWBERRY committed further acts of judicial deception by destroying audio evidence of G.L.'s School Interview, which was material to the finding of probable cause against G.L.'s mother, then lied to the Court and defense counsel by claiming that the data was irretrievably lost and could not be recovered despite their repeated refusals to allow an independent IT expert to examine the laptop and cell phone issued to CATANIO by the CITY OF FOLSOM.

169.

170.

46

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

171.    A government tort claim containing claimant's contact information was filed by Mrs. Faun O'Neel with the Folsom City Clerk on June 17, 2021 alleging Folsom Police Detective Melanie Catanio fabricated evidence in another child abuse investigation (See Ex. A); Defense counsel for G.L.'s mother Mrs. Patricia Lane filed a <u>Pitchess</u> motion on June 23, 2021 in Sacramento Superior Court in Case No. 19FE010439 seeking all documents recording any complaint registered with the City of Folsom by any private citizen alleging fabrication of evidence, and the contact information for the person(s) who filed such complaint(s) (See Ex. C); and a <u>Pitchess</u> hearing was held on July 7, 2021 in Sacramento Superior Court regarding Detective Melanie Catanio in the <u>People v Lane</u> case and Defendant Canepa testified as City of Folsom's custodian of records (See Ex. D).

172.

173.    Defendant CANEPA withheld the O'Neel claim and related claimant contact information in violation of the Court's order despite the fact that it was obviously responsive. The O'Neel claim alleged in paragraph 11 that CATANIO fabricated evidence regarding the parents' history of drug abuse in another child abuse investigation: "Officer <u>Melanie Catanio entered the</u>

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

home and interview [sic] the children, once again without consent or a parent present. During their time at the family home, unfounded accusations were made towards Faun and Danny O'Neel by Folsom PD officers, including that Ms. O'Neel had her children removed from her care in the past due to drug abuse. The children were then removed from the family home by Folsom PD Officers and transported to Folsom Police Department." Ex. A at p. 4 (emphasis added).

174.    CANEPA works in the same Folsom City Hall building at 50 Natoma Street in Folsom where the O'Neel claim was filed just one week prior to the Pitchess motion and had complete access to the O'Neel Claim at all times relevant. Ex. A at p. 1; Ex. C at p. 5.

175.    The actions and omissions of CITY OF FOLSOM employees CATANIO, ROWBERRY and CANEPA were a willful use of the court's process in bad faith.

176.    CATANIO harassed G.L., then persuaded the DA to bring charges against his mother pertaining to G.L. with ulterior motives and knowledge that there was no probable cause for the counts pertaining to G.L. CATANIO prevented G.L. from testifying at his mother's preliminary hearing to conceal the fact that CATANIO was lying at the preliminary hearing and thereby expose the complete lack of probable cause to support the charges pertaining to G.L. that were added to the FAC.

177.    CATANIO and ROWBERRY further conspired to conceal and destroy audio recording(s) of CATANIO's first School Interviews with G.L. and his sister, which was exculpatory evidence as to the three counts pertaining to G.L., in violation of their *Brady* duties. Such concealment continued all the way through trial in August of 2021.

178.    Defendants acted maliciously and for a purpose other than bringing justice to G.L. G.L. was burdened and aggrieved by the judicial deception perpetrated by CATANIO, ROWBERRY & CANEPA – all of whom were members of law enforcement with a duty to uphold the Constitution.

## FIFTH CAUSE OF ACTION
### *MONELL* RELATED CLAIMS
**(Against Defendant CITY OF FOLSOM)**

180.    Plaintiff re-alleges and reincorporates each and every allegation contained in the Factual Allegations and all previous paragraphs of all previous Causes of Action in this

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Complaint, inclusive, as though fully set forth herein.

181.    CITY OF FOLSOM, including through its Folsom Police Department entity, is a "person" within the meaning of 42 U.S.C. § 1983 and subject to *Monell* liability. (*Monell v. Dept. of Social Services* (1978) 436 U.S. 658.)

182.    Defendant CITY OF FOLSOM, including through its agencies, had a duty to Plaintiff at all times to establish, implement and follow policies, procedures, customs and/or practices (hereinafter "policy" or "policies") which confirm and provide the protections guaranteed Plaintiff under the United States Constitution, including those under the Fourth and Fourteenth Amendments, to include without limitation, the protection of the right to familial relations; the right to privacy; the right not to be defamed or stigmatized; the right to be free from unlawful searches and seizures; the right to procedural due process; and the right to equal protection of the law.

183.    Defendant CITY OF FOLSOM also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiff in order to avoid causing the injuries and damages alleged herein. Based on the duties charged to the CITY OF FOLSOM, including the nature of work related to child abuse investigations, CITY OF FOLSOM knew or should have known of the obvious need to establish customs, policies, practices and adequate training required to protect the aforementioned civil rights of parents and their children as were violated as described herein above.

184.    Defendant CITY OF FOLSOM established and/or followed policies, procedures, customs and/or practices which policies were the moving force behind the violations of Plaintiff's constitutional rights, including those under the Fourth and Fourteenth Amendments, by, but not limited to:

a.    The longstanding custom, practice, or policy of separating children from their parents without first having conducted a reasonable investigation;

b.    The longstanding custom, practice, or policy of failing to obtain a protective

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

custody warrant to remove children from parents or caretakers in the absence of exigent circumstances, and failing to train their employees to first obtain a warrant;

c.        The longstanding custom, practice, or policy of seizing children from parents without undertaking a particularized or reasonable investigation regarding whether each child should be removed in order to avert serious bodily injury;

d.        The longstanding custom, practice, or policy of failing to undertake lesser intrusive alternative means of ensuring child safety short of removal from the parents and/or imposition of no-contact protective orders;

e.        The longstanding custom, practice or policy of concealing witness tainting and other prior wrongdoings by Folsom Police Detectives from the Sacramento Superior Court in criminal investigations, *Pitchess* hearings, and felony trial testimony; and

f.        The longstanding custom, practice or policy of ignoring the personal experience(s) of Folsom Police employees that may render them incapable of being an unbiased witness or neutral information gatherer during criminal investigations – including, but not limited to, disregarding public statements by CITY OF FOLSOM employee(s) that they suffered from specific crime(s) while such employee(s) was actively assigned to investigate and neutrally evaluate said crime(s).

g.        The longstanding custom, practice or policy of failing to log evidence into the LYNX system, inadequate employee training regarding the preservation of evidence and chain-of-custody, and/or failing to implement reasonable training measures to prevent the destruction of evidence stored in electronic format(s) by CITY OF FOLSOM employees.

h.        By acting with deliberate indifference in implementing a policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments, when performing actions related to the investigation of child abuse, including proper handling of evidence, how/when to obtain a warrant, and avoiding contamination of witness testimony. (This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

proceedings. Plaintiff may seek leave to amend this pleading as more information becomes available.)

185.    CITY OF FOLSOM breached its duties and obligations to Plaintiff by, but not limited to, failing to establish, implement and follow the correct and proper Constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control and review its agents and employees as to their compliance with Constitutional safeguards; and by deliberately permitting its agents to engage in the unlawful and unconstitutional conduct as herein alleged with a total indifference to the rights of affected children, including G.L.

186.    CITY OF FOLSOM knew or should have known that by breaching the above-mentioned duties and obligations, it was reasonably foreseeable that said unconstitutional policies, practices, customs and usages would cause Plaintiff to be injured and damaged.

187.    These actions and/or inactions of CITY OF FOLSOM are the moving force behind, and the direct and proximate cause of Plaintiff's injuries, as alleged herein. As a result, Plaintiff has sustained general and special damages, to an extent and in an amount to be proven at trial. In addition, Plaintiff has incurred, and will continue to incur, attorney's fees, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount to be subject to proof at trial.

188.    CATANIO admitted during her testimony in the criminal trial against Mrs. L in July of 2021 that CITY OF FOLSOM failed to provide adequate employee training to prevent witness contamination in child sexual abuse investigations, and as to other Unconstitutional practices and policies within the CITY OF FOLSOM Police Department which form the basis of this *Monell* claim.

## **PRAYER FOR RELIEF**

A judicial determination of these issues, and of the respective rights and duties of Plaintiff and Defendants, is necessary and appropriate at this time under the circumstances.

WHEREFORE, PLAINTIFF prays for judgment against Defendants, and each of them, as follows:

1.    General and special damages to Plaintiff and against all Defendants in an amount

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Gavrilov & Brooks
2315 Capitol Avenue
Sacramento, CA 95816

to be determined at trial;

2. Injunctive relief, both preliminary and permanent, as allowed by law;

3. As against the individual defendants, punitive damages as allowed by law;

4. All costs and expenses of suit incurred and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

5. Any further relief and/or further order(s) as the Court may deem proper, including a declaratory judgment that Defendant CATANIO's conduct as complained herein violated the Constitution and/or that CATANIO violated her Brady responsibilities in Sacramento Superior Court criminal case #19FE010439 against Plaintiff's mother, People v. Patricia Lane.

Dated: September 26, 2022          **GAVRILOV & BROOKS**

By:_____
          Mary Anne Martin
          Attorney for Plaintiff G.L.

Exhibit Index:
A – O'Neel government tort claim v. CITY OF FOLSOM & CATANIO filed 6/17/21
B – Criminal protective order between G.L. and his mother filed 7/2/2019
C – *Pitchess* motion filed in re CATANIO on 6/23/21
D – Court reporter's transcript of the *Pitchess* hearing in re CATANIO dated 7/7/21
E – Appellant's Opening Brief filed in the Third Appellate District on 9/1/22

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS